**IT IS ORDERED as set forth below:**

**Date: November 6, 2024**

_____
**Lisa Ritchey Craig**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NUMBER |
| | : | |
| EDGEWOOD FOOD MART, INC., | : | 23-61204-LRC |
| | : | |
| | : | IN PROCEEDINGS UNDER |
| | : | SUBCHAPTER V OF CHAPTER 11 |
| Debtor. | : | OF THE BANKRUPTCY CODE |

### MEMORANDUM OF DECISION AND ORDER

Confirmation of the plan in this Subchapter V case filed by gas station and convenience store Edgewood Food Mart, Inc. ("Debtor") requires the Court to resolve four central issues: whether Debtor's plan was proposed in good faith, whether Debtor's plan is feasible, whether the plan meets the liquidation test, and whether the plan is fair and equitable. Debtor seeks confirmation of a nonconsensual under § 1191(b) that provides

for payments of projected disposable income over a three-year period.    Creditor Lamar Lester ("Mr. Lester") voted to reject the plan and objected to it, raising seven reasons why the plan fails to satisfy §§ 1191(b) and 1129(a)(3), (a)(7), and (a)(11).    Docs. 122, 166, 173.

On August 8, 2024, the Court held an evidentiary hearing on confirmation, at which Debtor, Mr. Lester, 400 Edgewood, LLC, the Subchapter V Trustee, Truist Bank, and the United States Trustee appeared.    This is a core proceeding, over which this Court has subject matter jurisdiction.    *See* 28 U.S.C. §§ 1334; 28 U.S.C. §§ 157(b)(2)(A), (b)(2)(L). For all the reasons stated below, the Court finds that the plan is confirmable under § 1191(b) and will direct Debtor's counsel to submit a proposed confirmation order conforming to this Memorandum of Decision and Order with signatures of the Subchapter V trustee and counsel for the United States Trustee.

## I.    **Procedural History**

Debtor filed a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code on November 10, 2023 (the "Petition Date").    Debtor has continued as a debtor-in-possession, has timely filed all required documentation, and has been responsive to Mr. Lester's numerous filings, which included a motion to dismiss or convert the case as a bad faith filing, objections to Debtor's application to employ counsel, and objections to the compensation of Debtor's counsel.    *See* Docs. 15, 77, 136, 137.

On February 8, 2024, Debtor filed its *Chapter 11 Small Business Subchapter V Plan.*

2

Doc. 101.   The hearing on confirmation was originally scheduled for April 18, 2024.

Doc. 108.   Mr. Lester filed his ballot rejecting the plan on March 12, 2024.   Doc. 112.

Mr. Lester filed his *Objection to the Plan* on April 9, 2024—one day late—and filed a

*Motion to Permit One Day Late Objection to Plan*.   Docs. 122, 123.   Debtor opposed the

extension of time and requested the Court not consider the late objection.   Doc. 127.   On

April 17, 2024, Mr. Lester then filed a *Motion to Continue the Confirmation Hearing from

April 18, 2024 A.D.* ("Motion for Continuance").   Doc. 128.   That same day, the Court

held a status conference regarding Mr. Lester's late-filed objection and the Motion for

Continuance and granted the Motion for Continuance to give Mr. Lester an opportunity to

seek additional bankruptcy counsel to assist with the confirmation issues.   Although

additional bankruptcy counsel filed a notice of appearance on Mr. Lester's behalf, counsel

did not otherwise participate in the proceedings.   Thereafter, Mr. Lester filed an *Amended

Objection to Confirmation of the Plan*, Doc. 166, followed by a *First Amendment to

Amended Objection to the Plan*, Doc. 173.   Mr. Lester also filed a *Motion to Compel

Debtor in Possession to Take Requisite Action to Avoid the Preference of Its Sole

Stockholder and Its Related Entities or In the Alternative, Grant Lester Permission to Act

on Behalf of the Debtor* (the "Motion to Compel")*.   Doc. 154. The Court scheduled an

evidentiary hearing on confirmation and the Motion to Compel for August 8, 2024.   Doc.

175.[1]

Debtor modified the plan prior to confirmation.    Doc. 187 (hereinafter the "Plan").[2]
Following the hearing, which began on August 8, 2024, and concluded on August 14, 2024,
the parties submitted Proposed Findings of Fact and Conclusions of Law and filed post-
hearing briefs.    Given Mr. Lester's rejection of the Plan and objections, Debtor requested
confirmation of the Plan as a nonconsensual plan under § 1191(b).    The Plan proposes
paying creditors from Debtor's projected disposable income by continuing operations and
making payments over a three-year period.    If Debtor's actual income is insufficient to
make the payments, Debtor's principal, Amin "Alex" Panjwani ("Mr. Panjwani"), has
escrowed sufficient funds to make the payments by tendering $159,000 to Debtor's attorney
to hold in trust.    The Plan establishes four classes: Class 1: Priority Tax claims of the
Internal Revenue Service; Class 2: General Unsecured Claims; Class 3: Interests; and Class
4:  Mr. Lester's Partially Secured Judgment Lien.    The Plan assumes the lease of the
Property and, while the cure amount that would ordinarily be required to be paid in full as
as a priority claim assume the lease is $145,577.27, 400 Edgewood has agreed to have the
cure amount treated as a Class 2 general unsecured claim. *See generally* 11 U.S.C. §
365(b)(1).

---

[1]  Mr. Lester conceded on the record during the evidentiary hearing that the Motion to Compel lacked evidentiary
support and formally withdrew it.  *See* Transcript (Doc. 193) at 95.
[2]  The Plan does not adversely change the treatment of the claim of any creditor or the interest of any equity security
holder of Debtor in such a manner to cause a creditor which previously voted in favor of the original plan to change
its vote; and, in fact, it improves the recovery for Class 2 creditors.

Under the Plan, Debtor has bifurcated Mr. Lester's claim, providing that Mr. Lester shall have a Class 4 secured claim in the amount of $2,500, the value of the property to which Mr. Lester's judgment lien attaches.   Class 4 is to be paid first when monthly payments commence.   The remaining portion of Mr. Lester's claim is treated as a Class 2 General Unsecured Claim.   Class 2 claims are to be paid on a pro rata basis in monthly payments until the projected disposable income has been fully exhausted.   The Class 1 claim of the IRS would have been paid in full on the effective date, had the IRS not amended its claim to $0.   *See* Claims Register, Claim 2-1.   Mr. Panjwani will retain his equity interest (Class 3) in Debtor.

Debtor proposes a "waterfall plan" in which it will pay the following:

| Month | Payment |
|---|---|
| Month   1-12 | $ 36,000.00 |
| Months 13-24 | $ 40,000.00 |
| Months 25-36 | $ 83,000.00 |

Doc. 101, p. 10.   In addition to paying the shortfall of any plan payments Debtor cannot pay, Mr. Panjwani has agreed to pay all allowed administrative expense claims from his personal funds.

Debtor's budget shows that the net overall plan income is projected to be $159,000. The first year Debtor is projected to have a loss of $82,000; the second year Debtor is projected to have net income of $97,000; and the third year, Debtor is projected to have net income of $144,000.   Rather than waiting until Debtor has positive cash flow, Debtor

5

proposes to begin making distributions to creditors in year 1.  Even if Debtor's actual income is less than Debtor's projection, the funds escrowed by Mr. Panjwani guarantee that creditors will get at least $36,000 in distributions that first year.

## II.  **Factual Findings**[3]

1. Debtor has operated a gas station and convenience store since 2005 or 2006.  *See* Testimony of Mr. Panjwani ("Panjwani Testimony"), Transcript (Doc. 191) at 187.

2. Debtor is located at 400 Edgewood Avenue, Atlanta, Georgia (the "Property").  *See id.*

3. Debtor leases the Property from 400 Edgewood, LLC ("400 Edgewood").  *See id.* at 189–90.

4. On the Petition Date, Debtor owed 400 Edgewood rent.  *See* id. at 189–90, 207. Debtor has paid lease payments of $14,000 per month to 400 Edgewood. Testimony of Spencer Shumway ("Shumway Testimony"), Transcript (Doc. 191) at 73–74.

5. Mr. Panjwani is the sole shareholder of Debtor.  *See* Panjwani Testimony, Transcript (Doc. 191) at 186–87.

6. Mr. Panjwani is also Debtor's CEO.  *See id.* at 208.

7. 400 Edgewood is owned by A&M Partners, Inc., which is solely owned by Mr.

---

[3]  In making its findings of fact, the Court has reviewed the Proposed Findings of Facts provided by Debtor and Mr. Lester, as well as the record, and has considered the testimony of all witnesses and the admitted exhibits.

Panjwani.  *See id*. at 189–90.

8. Debtor had no financial problems prior to August of 2021.  *See id*. at 194.

9. In August of 2021, a shooting occurred at the Property.  *See id.*

10. At the time of the shooting, Debtor had a $1,000,000 general liability insurance policy with a limit of $100,000 in coverage for assault and battery.  *See id.* at 197–98.

11. Mr. Lester received $100,000 for his injuries from Debtor's insurance carrier.  *See* Shumway Testimony, Transcript (Doc. 191) at 89.

12. Mr. Lester sued Debtor, 400 Edgewood, Mr. Panjwani, Debtor's security company, and the individual who fired the gun.  *See* Panjwani Testimony, Transcript (Doc. 191) at 194–95.

13. Prior to entry of judgment, all defendants but Debtor were dismissed.  *See id.* at 196–97.

14. Mr. Lester ultimately secured a judgment of $2,375,000 against only Debtor.  *See id.* at 197.

15. Debtor became insolvent after the judgment was entered against it.  *See* Shumway Testimony, Transcript (Doc. 191) at 93.

16. After Mr. Lester filed a garnishment suit against Debtor, Debtor's payroll checks bounced, vendor checks bounced, the automatic teller machine ("ATM") was removed from the building, the Georgia Lottery required a bond from Debtor, and

7

the fuel supplier stopped deliveries.  *See* Panjwani Testimony, Transcript (Doc. 191) at 202–03.

17.  The City of Atlanta filed a public nuisance action against Debtor.  *See id.* at 199.

18. The City directed Debtor to close between midnight and 5:00 AM.  *See id.*

19. Although Debtor appealed the lower court ruling and won before the Georgia Supreme Court, Debtor's nonbankruptcy counsel advised Debtor to remain closed during the early morning hours because counsel predicted the City would likely find another way to close Debtor's business.  *See id.* at 199–200.

20. Prior to closing at midnight, Debtor did a substantial amount of business from midnight to 5:00 A.M.  *See* Shumway Testimony, Transcript (Doc. 191) at 81.

21. Historically, Mr. Panjwani received a salary and significant distributions from Debtor.  *See id.* at 64-65.

22. Mr. Panjwani will not receive a salary under the Plan.  *See* Panjwani Testimony, Transcript (Doc. 191) at 207.

23. Prior to the Petition Date, Mr. Panjwani funded Debtor's defense of the litigation with the City of Atlanta and caused Debtor to reimburse him $78,532.  *See* Shumway Testimony, Transcript (Doc. 191) at 65–66.  Debtor's bankruptcy counsel and accountant advised Mr. Panjwani to return those funds prior to the commencement of this case, and Mr. Panjwani did so.  *See id*.

24.  Debtor's bankruptcy counsel and accountant also advised Mr. Panjwani to cause an

8

affiliate company to repay early a receivable owed to Debtor to clean up the accounting. *See id*. at 71–72.

25. In managing Debtor and his other businesses, Mr. Panjwani strictly observed corporate formalities. *See id*. at 65–66.

26. During the Confirmation Hearing, Mr. Panjwani, 400 Edgewood, and Truist Bank supported confirmation. *See* Transcript (Doc. 191) at 39–40.

27. 400 Edgewood purchased the Property, and Debtor has never been on the title to the Property. *See* Panjwani Testimony, Transcript (Doc. 191) at 191; Exh. D2.

28. In 2019, 400 Edgewood refinanced the acquisition loan with BB&T Bank on the Property because the loan was maturing (the "Note"). *See id*. at 192. At that time, BB&T Bank required Debtor be added as a co-borrower to the Note. *Id*. at 192–93.

29. It is standard practice for Truist and BB&T for a loan to a small privately held business to be made to the real estate holding company and for the operating company to either be a co-borrower or to be a guarantor. *See* Testimony of Houston Bass, Transcript (Doc. 191) at 22–23.

30. Debtor has never paid anything towards the Note, and—had 400 Edgewood failed to pay the Note, Debtor would not have paid the Note, as Mr. Panjwani, as guarantor, would have done so first. *See* Panjwani Testimony, Transcript (Doc. 191) at 193. During the confirmation hearing, 400 Edgewood refinanced the Note, and Debtor's

9

obligation to Truist Bank was, therefore, satisfied.  *See* Panjwani Testimony, Transcript (Doc. 192) at 58–59; Panjwani Testimony, Transcript (Doc. 193) at 12.

31. On the Petition Date, the value of Debtor's tangible assets was between $1,500 and $2,500, excluding the tobacco, alcohol, and lottery products.  *See* Testimony of Scott Schwartz ("Schwartz Testimony"), Transcript (Doc. 191) at 13.

32. Sale of tobacco, alcohol, and lottery products requires special licensing.  *See id*. at 13.

33. Debtor's projected disposable income, as stated in the Plan, was calculated by Mr. Panjwani and his accountants using the business data for January and February of 2024. *See* Shumway Testimony, Transcript (Doc. 191) at 95.

34. Mr. Shumway is an expert in forensic analysis and accounting and has been working with Debtor on this case since before the Petition Date.  *See id*. at 61–62.

35. Debtor's projected disposable income of $159,000 is an optimistic estimate because it is based on the assumption that Debtor will be able to reopen during the late-night hours.  *See id*. at 95–98.

36. The calculation of projected disposable income assumes that it will take approximately six months to get a profitable ATM back in the store.  *See id*. at 96.

37. The in-store ATM historically has brought in $3,500 to $4,500 per month.  *See id*. at 82, 176.

38. Mr. Panjwani has escrowed $159,000 with Debtor's counsel to make any plan

payments Debtor is unable to fund through operating income. *See* Panjwani Testimony, Transcript (Doc. 191) at 206.

39. Mr. Shumway prepared the Monthly Operating Reports ("MOR"s) for Debtor using financial statements from Debtor's external CPA firm and the more detailed financial records from Debtor's internal accountants. *See* Shumway Testimony, Transcript (Doc. 191) at 101–02.

40. The MORs filed by Debtor in this case included all information Debtor is required to disclose, as well as additional information regarding gross sales and expenses that would be required for the preparation of Debtor's tax returns. *See id*. at 112–13, 119, 130. The gross sales information includes the credit card sales for fuel that are paid through a merchant processing system that deducts amounts owed for the fuel before the remainder is distributed to Debtor. *See id*. at 106–07.

41. Mr. Panjwani will not get a salary for three years under the Plan and has agreed to pay all administrative expense claims with his personal funds. *See* Panjwani Testimony, Transcript (Doc. 191) at 207; Transcript (Doc. 193) at 6–7.

42. Mr. Panjwani caused 400 Edgewood to agree to the reclassification of its lease cure payment to a general unsecured claim and to extend the term of the lease through the plan term, but not beyond. *See* Panjwani Testimony, Transcript (Doc. 191) at 206–07; Plan, § 11.1.

43. Mr. Panjwani has made these concessions to ensure that Mr. Lester receives some

repayment on his claim. *See* Panjwani Testimony, Transcript (Doc. 191) at 207–08.

### III. __Legal Analysis__

The Court's legal analysis will address the following: (A) the general confirmation requirements for a Subchapter V Plan (§§ 1190, 1191, and 1129(a)); (B) good faith under § 1129(a)(3); (C) the liquidation test of § 1129(a)(7); (D) feasibility under § 1129(a)(11); and (E) the unfair discrimination and fair and equitable requirements imposed by § 1191(b).

### A. Confirmation of a Subchapter V Plan

#### 1. 11 U.S.C. § 1190

Under § 1190, a plan filed under Subchapter V shall include (A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization. 11 U.S.C. § 1190(1). Additionally, the plan shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan. *Id*. § 1190(2).

No party objected on the basis that the Plan does not satisfy §§ 1190(1) or 1190(2), and, after a review of the Plan, the Court finds that it contains the information required by § 1190(1) and meets the requirements of §§ 1190(2). Specifically, the Plan at § 1.1 provides the history of Debtor's business. Section 1.4 references the liquidation analysis,

which is attached as Exhibit "A".   Detailed projections regarding Debtor's ability to make

the plan payments are included in Exhibit B, and the Plan includes the clear statement that

funds sufficient to make all plan payments have been escrowed in the event Debtor is unable

to make the payments from operating income.

### 2.  11 U.S.C. § 1191

#### a.  § 1191(a)

Under § 1191(a), the Court shall confirm a Subchapter V plan only if all the

requirements of § 1129(a), other than paragraph (15) of that section, are met.   Debtor

cannot satisfy § 1129(a)(8) (that each class of claims or interests has either accepted the

plan or is not impaired under the plan).   Accordingly, the Plan cannot be confirmed under

§ 1191(a).

#### b.  § 1191(b)

The Court shall confirm a plan under § 1191(b) if: (1) the plan meets all the

applicable requirements of § 1129(a), other than §§ 1129(a)(8), (10), and (15); (2) the plan

does not discriminate unfairly; and (3) the plan is fair and equitable with respect to each

impaired, nonaccepting class of claims or interests.   11 U.S.C. § 1191(b).   The "standards

for unfair discrimination under § 1191(b) are the same as under § 1129(b)(1)."   *In re*

*Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 812 (Bankr. W.D. Tex. 2024).

"When considering discrimination between classes of claims and whether the treatment is

unfairly discriminatory the classes of claims must be of the same priority."   *In re 431 W.*

*Ponce De Leon, LLC*, 515 B.R. 660, 681 (Bankr. N.D. Ga. 2014). A plan is fair and equitable if: (1) with respect to secured claims, the plan meets the requirements of § 1129(b)(2)(A); and (2) as of the effective date of the plan, the plan provides that all the projected disposable income of the debtor to be received in the three-year period, or such longer period not to exceed five years as the Court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan, or the value of the property to be distributed under the plan in the three-year period, or such longer period not to exceed five years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor; (3) the debtor will be able to make all payments under the plan; or (i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and (ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made. *Id*. § 1191(c). For this purpose, "disposable income" means the income that is received by the debtor and that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor. *Id*. § 1191(d).

As to secured claims, § 1129(b)(2)(A) "lists three alternative ways that a plan may treat a secured claim to meet the 'fair and equitable' requirement." *In re Riddle*, 444 B.R. 681, 685 (Bankr. N.D. Ga. 2011). These include: (1) retention of the lien securing the

claim to the extent of the allowed amount of the claim; and deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (2) the sale, subject to section 363(k) of this title, of any property that is subject to the lien; or (3) the realization of the indubitable equivalent of such claim.   11 U.S.C.A. § 1129(b)(2)(A).

Debtor has the burden to show by a preponderance of the evidence that the Plan meets these confirmation requirements.   *See In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 809 (Bankr. W.D. Tex. 2024).   No party disputes, and, after an independent review, the Court concludes, that the Plan either satisfies §§ 1129(a)(1), (a)(2), (a)(4), (a)(5), (a)(6), (a)(9), (a)(12), (a)(13), (a)(14), (a)(15), and (a)(16), or that such requirements are not applicable.   Further, the Court concludes that the treatment of Mr. Lester's secured claim satisfies § 1129(b)(2)(A)(i), and therefore, § 1191(b), because it allows for the retention of Mr. Lester's lien to the value of his allowed claim, as established by the unrebutted testimony of Mr. Schwartz, and payment of that amount.   Mr. Lester argues that the Plan should not be confirmed because it fails to satisfy §§ 1129(a)(3) (good faith), 1129(a)(7) (the liquidation test), and 1129(a)(11) (feasibility).   Additionally, he asserts that the plan fails to satisfy § 1191(b) because it unfairly discriminates against Mr. Lester by limiting his distribution to an arbitrary amount and to only three years' worth of projected disposable income instead of five years' worth.   The Court will address these objections below.

**B. Good Faith under 11 U.S.C. § 1129(a)(3)**

Mr. Lester objected to Debtor's plan under § 1129(a)(3), citing five reasons why the Court should conclude that the Plan was not proposed in good faith: (1) Debtor does not intend to continue in business beyond the plan term; (2) the Plan relies on inaccurate and unsupported financial projections; (3) Debtor has failed to disclose and is not pursuing a claim against Mr. Panjwani for breach of fiduciary duty due to his failure to obtain sufficient insurance; (4) Debtor has failed to disclose and pursue a claim that it owns the Property and a claim against Mr. Panjwani for breach of fiduciary duty in connection with ownership of the Property; and (5) Debtor has not proven that Mr. Panjwani, as the holder of the equity interests in Debtor will not continue to receive profits on account of those interests. Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means forbidden by law. "While the Bankruptcy Code does not define the term, courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the code." *In re Trimax Medical Management, Inc.*, 659 B.R. 398, 402 (M.D. Ga. 2024) (citing *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995)). "Those purposes include preserving jobs in the community, allowing the business to continue to operate instead of liquidation, and achieving a consensual resolution between debtors and creditors." *In re Seaside Engineering & Surveying, Inc.* 780 F.3d 1070, 1082 (11th Cir. 2015) (citing *In re United Marine, Inc.*, 197 B.R. 942, 947 (Bankr. S.D. Fla.1996)). "Where the plan is proposed with

16

the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995). In assessing whether the plan was proposed in good faith, the Court considers the plan itself as well as the totality of circumstances surrounding the plan. *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus.* (*In re Piper Aircraft Corp.*), 244 F.3d 1289, 1300 (11th Cir. 2001).

First, Mr. Lester argues that the Plan was not proposed in good faith because it was not proposed for the purpose of reorganization.   Mr. Lester particularly emphasizes the idea that the purpose of Chapter 11 reorganization is to allow a debtor to "stand on its own two feet."   In contrast, he asserts Debtor's purpose for filing this case was to keep Debtor operating for the "minimum amount of time required under Chapter 11 so that Mr. Lester's judgment will be discharged."   In response, Debtor submits that what becomes of Debtor's business after performance of the Plan is irrelevant and does not impact confirmation. Debtor further argues that the Plan goes above and beyond the requirements of good faith by ensuring plan payments will be made regardless of Debtor's profitability and maximizing available funds for unsecured creditors.

The purpose of § 1129(a)(3) is to ascertain if the plan was proposed in good faith. Even liquidation plans have been found to have been proposed in good faith.  *See In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 673 (Bankr. N.D. Ga. 2014).   Debtor, when faced with Mr. Lester's large judgment against it, could have closed its doors, leaving all

17

its creditors without recourse.   But it did not.   Debtor could have filed Chapter 7, liquidated its minimal assets and given creditors a lower payoff.   But it did not. Instead, Debtor filed Chapter 11.   Debtor set out to reorganize its debts, allowing creditors to get more than if Debtor had filed Chapter 7 or simply closed the business and dissolved under state law.   *See* Scott Schwartz Testimony, Transcript (Doc. 191) at 13; Shumway Testimony, Transcript (Doc. 191) at 98.   Debtor, through its Plan, negotiated a plan with concessions from Mr. Panjwani and 400 Edgewood that made a three-year plan more beneficial to creditors than even a five-year plan without such concessions.   *See* Transcript, (Doc. 193) at 105–06.   The subordination of 400 Edgewood's cure payment, the payment of administrative expenses outside the plan, and the waived salary of Mr. Panjwani will result in the three-year plan providing more money, more quickly than a five-year plan without such concessions.   *See* Panjwani Testimony, Transcript (Doc. 191) at 206–07, (Doc. 191) at 6–7.   All these actions show Debtor's good faith in proposing the Plan.   *See generally In re Urgent Care Physicians, Ltd*., 2021 WL 6090985, at *4 (Bankr. E.D. Wis. Dec. 20, 2021) ("There is no evidence that the debtor is incurring unnecessary expenses or providing favored treatment to insiders.   Rather, those insiders are sacrificing to help ensure business continuity and creditor repayment.").

Further, the Bankruptcy Code does not contain a requirement that a debtor demonstrate its intent to continue operating its business indefinitely to show good faith, and the Court's research discloses no cases to support such a requirement.   Admittedly, one of

the factors to consider is the benefit to the community in retaining a going concern, but retaining a business for even three years provides a benefit to the community that would otherwise be unavailable and is sufficient to show that a plan was proposed for and has a likely chance of achieving a result consistent with the objectives and purposes of the Bankruptcy Code.   Contrary to Mr. Lester's assertions, proposing a plan to obtain a discharge of debt after a period of repayment that otherwise complies with the confirmation requirements of Subchapter V is not bad faith.   Receiving a discharge in exchange for repayment of a portion of debt is a fundamental feature of both Chapter 11 and Chapter 13.

Second, Mr. Lester alleges that Debtor failed to provide reliable financial projections.   Mr. Lester highlights the "failure" of Debtor to provide evidence to support the operating reports that it used to make the projections and asserts that the Court has no evidentiary basis to conclude the projections are reliable.   Debtor responds that Mr. Lester ignores the evidence presented at confirmation.   Debtor compares and contrasts the testimony of the two experts, Mr. Shumway for Debtor and Mr. Richard Rose for Mr. Lester, who reviewed the financials in this case.   Debtor emphasizes that Mr. Shumway, a CPA with over 35 years of bankruptcy-related experience, worked with Debtor throughout the case and testified that he worked with Debtor's internal and external accountants, who he found efficient, effective, detail-oriented, and knowledgeable, to create the MORs from the information they provided.   In contrast, Mr. Rose is also a CPA but has almost no experience in bankruptcy cases.   Mr. Rose spent "at least a couple of hours" looking at

some of the financial records in this case and did not contact Debtor or anyone affiliated with Debtor with any questions.

The Court agrees with Debtor. Debtor's MORs were prepared by a CPA with extensive experience in bankruptcy cases, using information provided by two teams of accountants. *See* Shumway Testimony, Transcript (Doc. 191) at 101–02. Further, the United States Trustee, as represented by Jonathan Adams, reported that the MORs comply with the United States Trustee's operating guidelines and contained no irregularities. Transcript (Doc. 193) at 120–21. Additionally, the evidence suggests that, if the financial projections are inaccurate, it is because Mr. Shumway, with Mr. Panjwani and one of Debtor's accountants, arrived at an optimistic projected disposable income, relying on sales information, assumptions about when the ATM would return, and a hopeful increase in business based on the store reopening for business in the early morning hours, even while Mr. Panjwani doubted this would occur during the plan term. *See* Shumway Testimony, Transcript (Doc. 191) at 95–98; Panjwani Testimony, Transcript (Doc. 191) at 199-200.

The only testimony Mr. Lester relies on to call the projections into question is that of Mr. Rose, who testified that accountants rely on source documents to calculate net income and that he was not provided source documents to support Debtor's net income as stated in the MORs. This testimony does not establish that such source documents do not exist or were not reviewed by Debtor's accounting professionals, including Mr. Shumway. In fact, Mr. Shumway testified credibly that Debtor's accountants reviewed documents to

20

obtain the amount of Debtor's share of credit card receipts (after payment to the jobber for the cost of the fuel). He also testified that he was able to trace that number directly to Debtor's bank statement. Shumway Testimony, Transcript (Doc. 191) at 75–76. According to Mr. Shumway's testimony, the MORs included additional information regarding gross sales that must be reported on Debtor's tax returns but is not required to be included in the MOR and Debtor included this information simply to provide full and complete disclosure. Thus, the evidence in this case does not support a finding that the MORs are incomplete or that the financial projections are inaccurate in a way that would prejudice Mr. Lester, and it certainly does not establish that Debtor lacked good faith in proposing a plan that relies on financial projections based on the figures in those MORs.

Third, Mr. Lester claims that Debtor's failure to disclose and pursue collection of a cause of action against its principal for a breach of fiduciary duty for his failure to obtain liability insurance for injuries suffered on the Property is another example of Debtor's lack of good faith in proposing the Plan. Mr. Lester argues that Mr. Panjwani breached his duty to Debtor by failing "to fulfill [his] obligation to acquire general liability insurance in the amount of at least $1 million." Transcript (Doc. 191) at 53. Debtor replies that Mr. Lester cannot meet any of the elements of a breach of fiduciary duty claim, primarily because Debtor had general liability insurance of $1,000,000 with coverage of $100,000 for assault and battery.

Where the debtor's management has a "serious problem of conflict of interest" that

would prejudice creditors, courts have found that a plan was not proposed in good faith. For example, in *Matter of Fiesta Homes of Georgia, Inc*., 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990), the court found the plan was not confirmable where debtor's management would have been obligated to pursue preference actions against several close members of the debtor's officers' family.   The court noted, however, that the "situation would be far different" if the amount to be recovered were a small amount or if the unsecured creditors' distribution was not so heavily dependent on the preference recovery.   *Id*.   Ordinarily, if such an extensive conflict exists, the remedy is to remove the debtor as debtor in possession or conversion to Chapter 7.   Here, unlike *Fiesta Homes of Georgia*, the Plan provides meaningful distributions to creditors that do not depend upon the proceeds of any potential suit by Debtor against Mr. Panjwani for breach of fiduciary duty.   This is not a case where a debtor's failure to pursue a cause of action requires a finding that the plan was not proposed in good faith.   Further, the evidence does not support a finding that Debtor has such a cause of action or, if it does, that Debtor has violated the business judgment rule by deciding not to pursue it.

A claim for breach of fiduciary duty against officers of a Georgia corporation requires: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.   *Lubin v. Skow*, 382 F. App'x 866, 872 (11th Cir. 2010). Under Georgia law, a corporate officer "shall perform [his] duties . . . in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under

similar circumstances." O.C.G.A. § 14-2-842(a). To succeed on a claim for breach of fiduciary duty against Mr. Panjwani, Debtor would have had to rebut the presumption that "the process [Mr. Panjwani] followed in arriving at decisions was done in good faith and that [he] exercised ordinary care" with evidence that his decision constituted "gross negligence by being a gross deviation of the standard of care of an officer in a like position under similar circumstances." O.C.G.A. § 14-2-842(c). In other words, the applicable statute "effectively requires a party asserting a claim for breach of the duty of care to demonstrate gross negligence (or bad faith) before liability may be imposed on a director or officer." Carey, Michael P., GEORGIA BUSINESS LITIGATION 2022, Chapter 1, p. 8.

The evidence established that Debtor did have general liability insurance of $1,000,000.00 and assault and battery insurance of $100,000. *See* Panjwani Testimony, Transcript (Doc. 191) at 197–98. Given the existence of a presumption in Mr. Panjwani's favor that he acted in good faith and exercised ordinary care, the Court concludes that Debtor did not act in bad faith by deciding not to pursue a claim for breach of fiduciary duty against Mr. Panjwani and instead negotiating the considerable concessions from him that will allow Debtor to repay a portion of its debts from its operating revenues.[4]

Fourth, Mr. Lester submits that Debtor acted in bad faith by not disclosing and

---

[4] In his brief, Mr. Lester argues that Mr. Panjwani also breached his fiduciary duty to Debtor by not ensuring that Debtor's security company obtained an insurance policy that would cover Mr. Lester's injury. The evidence cited, however, was not introduced at trial. *See* Doc. 195 at 20 (citing a deposition transcript). Accordingly, the Court has not considered it.

pursuing its equitable interest in the Property and by not pursuing a claim against Mr. Panjwani for breach of his fiduciary duty to Debtor when he failed to cause 400 Edgewood to convey the Property to Debtor.   Throughout these proceedings, Mr. Lester has argued that, despite not being the record owner of the Property, Debtor has an equitable interest in the real estate because Debtor became a co-borrower on the loan obtained when 400 Edgewood refinanced the Property (the "Note").   Mr. Lester alleges that 400 Edgewood's refinancing of the Note to remove Debtor as an obligor during the trial was an effort to subvert Debtor's equitable interest in the Property and a further showing of Debtor's bad faith in proposing the Plan.

In response, Debtor argues that Mr. Panjwani had no fiduciary duty to cause 400 Edgewood to convey the Property to Debtor after it was added to the Note and that, even if he had a duty to not cause Debtor to become an obligor on the Note, Debtor was not damaged by becoming an obligor on the Note, as it never made any payments on the Note and, now that the Note has been refinanced, is no longer liable on the Note.   *See* Panjwani Testimony, Transcript (Doc. 192) at 58–59; Panjwani Testimony, Transcript (Doc. 193) at 12.   Debtor asserts that there was nothing irregular about the transaction, which was done at the request of the lender, and that such an accommodation is a common business practice and requirement of lenders.

The evidence presented confirms that Mr. Panjwani has organized his business affairs, as many do, by indirectly owning real estate in a real estate holding company and

24

operating a gas store and convenience store through a separate legal entity.   There are no

facts to support a claim under any legal theory known to the Court (constructive trust,

resulting trust, etc.) that Debtor is the owner of the Property.   The record also supports the

finding that Debtor's written lease of the Property from 400 Edgewood was an arm's-length

transaction under which the parties actually operated.   Nothing in the record supports a

finding that the lease was a sham or that the ownership structure utilized by Mr. Panjwani

was otherwise unfair to Debtor.   Indeed, the unrebutted testimony of Mr. Shumway

demonstrated that, in arranging his business affairs, Mr. Panjwani has meticulously

observed all corporate formalities.   The Court also credits the testimony of the

representative of 400 Edgewood's lender that Debtor's becoming a co-borrower on the

Note was not unusual.   *See* Bass Testimony, Transcript (Doc. 191) at 22–23.   Further, the

Court agrees with Debtor that, even assuming Debtor could show that Mr. Panjwani

breached his fiduciary duty to Debtor by obligating Debtor on the Note, Debtor could show

no damages, as Debtor never made any payments on the Note and paid what Mr. Lester has

agreed was fair market rent for its use of the Property.   *See* Transcript (Doc. 191) at 51–

52.   Accordingly, the Court cannot conclude that Debtor's failure to pursue a claim to the

Property or for breach of fiduciary duty against Mr. Panjwani shows a lack of good faith.

Fifth, Mr. Lester asserts that the Plan was not proposed in good faith because "it

does not have a process whereby the Court and Mr. Lester could verify that Mr. Panjwani

would not receive portions, if not all, of the profits from any alleged new operator of the

25

convenience store before the Court grants the discharge of Mr. Lester's claim."    According to Mr. Lester, it is "irrational" that Mr. Panjwani would spend the money he has spent and will spend in this case if the business is not profitable and he does not intend to continue to receive profits.    Mr. Lester objects to Mr. Panjwani's stated intention that, following completion of the Plan, he will cease Debtor's operations and cause 400 Edgewood to lease the Property to a "Mom and Pop" business.    Debtor criticizes this argument as nonsensical because what happens to the Property after completion of the Plan is between 400 Edgewood and a third party and is not relevant to confirmation.

Mr. Lester's objection is difficult to summarize, but he seems to be claiming that Debtor is being untruthful about its profitability and arguing that, for the Plan to be proposed in good faith, Debtor must ensure that Mr. Panjwani will not continue to benefit from his equity interest in Debtor.    As to the former, the Court has already addressed Mr. Lester's contention that Debtor is acting in bad faith by relying on inaccurate financial projections.    Mr. Lester questions why Debtor is not as profitable as it was prior to August 2023, but Mr. Shumway, a qualified expert witness, provided detailed testimony from which the Court can confidently conclude that certain events, including Mr. Lester's attempts to enforce his judgment, significantly reduced Debtor's profitability.    The Court also rejects Mr. Lester's suggestion that Debtor would have more disposable income if the "rent," which he insists on referring to as a "purported" expense, was added back into Debtor's income.    Nothing in this case supports a finding that Debtor does not incur an

26

expense for use of the Property that must be deducted to calculate its projected disposable income.   Even if the Court accepted Mr. Lester's theory that Debtor is the owners of the Property, Debtor would incur expenses as the owner of the Property, such as debt service, taxes, and insurance, and such an expense would reduce Debtor's projected disposable income, just as Debtor's payment of "rent" does.

As to the latter, the objection is essentially that, under the Plan, Mr. Panjwani will retain his equity interest in Debtor and that interest may enable him to earn future profits without requiring Debtor to pay its creditors in full.   Unlike in a traditional Chapter 11 case, where the "absolute priority rule" requires that holders of equity receive no property on account of those interests unless creditors are paid in full, in a Subchapter V case, which has no absolute priority rule, Mr. Panjwani may retain his equity interest in Debtor even if it has value without full payment of Debtor's creditors.   *Compare* 11 U.S.C. § 1129(b)(2) *with* § 1191(b).   So long as a debtor complies with the other confirmation requirements unique to Subchapter V, a plan that takes advantage of this feature of Subchapter V is not proposed in bad faith.   In short, none of Mr. Lester's objections to Debtor's good faith proposal of the Plan have merit.   The Court holds, based on the totality of the circumstances, that Debtor proposed the Plan in good faith.

**C. Satisfaction of the Liquidation Test under 11 U.S.C. § 1129(a)(7)**

Under § 1129(a)(7), each creditor must either have accepted the plan or must receive "not less than the amount that such holder would so receive or retain if the debtor were

27

liquidated under chapter 7."   11 U.S.C. § 1129(a)(7).   Section 1129(a)(7) "only requires that 'a dissenting creditor [receive] at least as much value as the dissenting creditor would receive under a Chapter 7 liquidation.'"   *In re Aspen Vill. at Lost Mountain Assisted Living, LLC*, 609 B.R. 555, 570 (Bankr. N.D. Ga. 2019).   "Applying the best interests of creditors test requires the Court to 'conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan.'"   *In re Affiliated Foods, Inc*., 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000).   In this analysis, the Court considers the value of the assets and the costs of sale, *Aspen Vill.,* 609 B.R. at 571, along with the Chapter 11 and Chapter 7 administrative expenses.   *See In re Maddox*, 84 B.R. 251, 259 (Bankr. N.D. Ga. 1987); *see also Affiliated Foods*, 249 B.R. at 789–90.

Under the Plan, Debtor would pay $159,000, which would not be reduced by the administrative costs of the Chapter 11 case.   Mr. Lester would first receive $2,500 of that amount in payment of his Class 4 allowed secured claim.   As there is no Class 3 claim to pay, the remaining $156,500 would be paid *pro rata* to Class 2 allowed unsecured claims. Mr. Lester would, therefore, receive 96% of that amount—$150,240—in payment of his Class 2 claim over a three-year period.

Debtor supports the Plan with a liquidation analysis wherein it determines what distributions would be made by a Chapter 7 trustee if the case converted to Chapter 7.   Doc. 101, Exh. A.   Mr. Shumway testified that he prepared the analysis with the assistance of Mr. Schwartz, Debtor's expert witness on the liquidation of assets of distressed businesses,

such as Debtor's.   Shumway Testimony, Transcript (Doc. 191) at 93; Schwartz Testimony

(Doc. 191) at 11–12.   Mr. Lester alleges that the Plan does not satisfy the liquidation test

because he would receive more than $150,249 through a Chapter 7 liquidation in which a

Chapter 7 trustee would pursue Debtor's claims discussed above to the Property and for

breach of fiduciary duty against Mr. Panjwani.   The facts of this case and the speculative

nature of the claims previously discussed, however, convince the Court that a Chapter 7

trustee would not pursue these causes of action.   Mr. Lester has articulated no viable legal

theory under which a Chapter 7 trustee could assert a claim to the Property, and, for the

reasons discussed above, the Court concludes that a hypothetical Chapter 7 trustee would

abandon any claim for breach of fiduciary duty against Mr. Panjwani as lacking merit and

likely to produce less than the cost of litigating it.   The Court, having reviewed the

liquidation analysis, supported by the testimony of Mr. Shumway and Mr. Schwartz

(Schwartz Testimony, Transcript (Doc. 191) at 13), concludes that a hypothetical Chapter

7 trustee would not administer this case as an asset case and, if a trustee did administer the

case, it would not result in the payment of anywhere close to $150,000 to Mr. Lester.

Mr. Lester also contends that he has made a formal offer to purchase Debtor's assets

for $250,000 and, in a Chapter 7 case, such an offer would produce a greater distribution

than $150,249 to Mr. Lester's Class 2 general unsecured claim.   First, the Court agrees

with Debtor that there is no evidence to support the *bona fide* nature of any offer to purchase

Debtor's assets.   No evidence was offered as to Mr. Lester's intent or his ability to pay

cash for Debtor's assets if the case converted to a Chapter 7.    Second, even assuming Mr.

Lester could and would pay cash for Debtor's assets, the Court does not find that $250,000

would result in a greater payment on Mr. Lester's Class 2 claim.    In a hypothetical

liquidation, a Chapter 7 trustee would liquidate Debtor's assets by selling the assets to Mr.

Lester in exchange for the $250,000 cash payment from Mr. Lester.    Pursuant to § 726(a),

the trustee would then pay Mr. Lester's Class 4 secured claim ($2,500),[5] the Chapter 7

administrative expenses, which would include a commission to the trustee calculated in

accordance with § 326 (approximately $15,750) and the Chapter 7 trustee's professionals'

fees ($7,000),[6] the unpaid Chapter 11 administrative expenses that Mr. Panjwani had

offered to pay under the Plan but would not be legally obligated to pay upon conversion

(approximately $100,000).[7]    After payment of these amounts that total $125,250, the

trustee would have, at most, $124,750 with which to pay general unsecured creditors, and,

---

[5]  In assuming the same payment on Mr. Lester's secured claim, the Court recognizes that, under Georgia law, Mr. Lester's judgment lien attached only to the assets that Mr. Schwartz valued as being worth $2,500.  The Court assumes that the remaining $247,500 of Mr. Lester's purchase offer would be allocated to Debtor's interest in the lease, good will, and the causes of action that Mr. Lester believes he could pursue.

[6]  The Court estimates this amount based on its experience in reviewing Chapter 7 final reports and applications for compensation for Chapter 7 trustee's attorneys and accountants.   Given the issues and contentious nature of this case, the Court estimates that a Chapter 7 trustee would employ an attorney who would spend approximately 10 hours at $400 per hour to file applications to employ counsel and an accountant, assist the trustee in researching the causes of action Mr. Lester has identified, assist in negotiating the sale of Debtor's assets to Mr. Lester, draft and file a motion to sell, and prepare and file an application for compensation for the trustee, trustee's counsel, and trustee's accountant. The Court estimates the accountant's fee at approximately $3,000 for, at a minimum, preparing a tax return for the estate.

[7]  The Court takes judicial notice of the docket in this case regarding the amount of fees and expenses that have been allowed and requested by Debtor's attorney and assumes that the amount not covered by a retainer ($20,628) and the amount requested in the Second Interim Application for Compensation, Doc. 200 ($81,453 in fees and $879.88 in expenses) would remain unpaid on the conversion date.   Additionally, this amount is clearly on the low end, as no application for compensation of Debtor's accountants has been filed.   Indeed, Mr. Lester's counsel has estimated Debtor's professional fees to date to be at least $250,000.   *See* Creditor Lamar Lester's Post Hearing Brief, Doc. 195 at 27.

accordingly, Mr. Lester's pro rata share would be well lower than the amount he will receive under the Plan.

### D.  Feasibility under 11 U.S.C § 1129(a)(11)

Under § 1129(a)(11), a plan is feasible if confirmation of the plan is not likely to be followed by liquidation or further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. "The purpose of the feasibility requirement is to protect creditors against unrealistic plans that have little or no chance of success." *In re Cheerview Enterprises, Inc.*, 586 B.R. 881, 902 (Bankr. E.D. Mich. 2018).   "A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable."   *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Arizona 1994) (citing *5 Collier on Bankruptcy* §1129.02[11] (15th ed. 1992)).   "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"   *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (quoting *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985)).   Here, the Plan promises to pay creditors at least $159,000.   It is supported by financial projections and is guaranteed to succeed in achieving that payout, as Mr. Panjwani has escrowed the funds to make up for any shortfall in Debtor's net income.

Mr. Lester asserts two reasons why the Plan is not feasible.   First, he claims that

this plan is not for the purpose of reorganization, as evidenced by Debtor's intention to cease operations at the end of the plan term.    Mr. Lester insists that § 1129(a)(11) requires a finding that Debtor will be able to "stand on its own two feet."    Second, he contends that Debtor has failed to provide reliable financial projections and, without accurate projections, the Court cannot find that the Plan is feasible.    Debtor argues that the Plan is clearly feasible.    Debtor points to the fact that, prior to Mr. Lester's judgment, Mr. Panjwani operated Debtor profitably and he will continue to oversee Debtor's operations post-confirmation.    Debtor also notes that the Plan includes a lease extension to enable Debtor to make the required payments and emphasizes that Mr. Panjwani has personally guaranteed the payments and has deposited the full $159,000 required to be paid into Debtor's counsel's trust account.

The Court, again, agrees with Debtor.    Section 1129(a)(11) recognizes that some plans will result in the liquidation of the Chapter 11 debtor.    The intentions of Debtor's principal and landlord with respect to the use of the Property after the plan term in no way impacts the feasibility of the Plan.    The feasibility requirement is about whether the plan can be completed as laid out, not about the long-term future of the business after bankruptcy.    "Chapter 11 expressly contemplates liquidations."    *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008) (citing 11 U.S.C. § 1129(a)(11) ("Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor

under the plan, unless such liquidation or reorganization is proposed in the plan."). Further, as discussed in detail above, Debtor has provided thorough and accurate financial projections. Although the projected disposable income is, as Mr. Panjwani and Mr. Shumway acknowledged, optimistic, *see* Shumway Testimony, Transcript (Doc. 191) at 98, even if Debtor makes less than projected, Mr. Panjwani has seen to it that the payments will be made by escrowing the entire amount. *See* Panjwani Testimony, Transcript (Doc. 191) at 206. With the plan payments guaranteed and the money waiting in the bank, the Court finds the Plan is feasible.

### E. Unfair Discrimination and Fair and Equitable

Finally, Mr. Lester submits that the Plan cannot be confirmed because it unfairly discriminates against his claim in violation of § 1191(b). As noted above, the "standards for unfair discrimination under § 1191(b) are the same as under § 1129(b)(1)." *In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 812 (Bankr. W.D. Tex. 2024). "When considering discrimination between classes of claims and whether the treatment is unfairly discriminatory the classes of claims must be of the same priority." *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 681 (Bankr. N.D. Ga. 2014). The only claim with the same priority as Mr. Lester's claim is that of 400 Edgewood. That claim is receiving the exact same treatment as that afforded to Mr. Lester's claim. Accordingly, the Court concludes that the Plan does not discriminate unfairly, or otherwise, against Mr. Lester's claim.

33

Although Mr. Lester did not specifically object to the Plan based on its failure to treat his Class 2 claim fairly and equitably, this is the essence of his objection, and the Court considers whether the Plan satisfies § 1191(b) in this regard.   The Plan is fair and equitable if it provides that all the projected disposable income of Debtor to be received in the three-year period, or such longer period not to exceed five years as the Court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.   *Id*. § 1191(c).   For this purpose, "disposable income" means the income that is received by the debtor and that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.   *Id*. § 1191(d).

The evidence is clear that all Debtor's projected disposable income received during the three-year plan period will be applied to make payments under the Plan.   It is also clear, for reasons previously stated, that Debtor can make the payments.   The only remaining question is whether Debtor's choice of a three-year period rather than a longer period, not to exceed five years, is fair and equitable.   In this regard, courts have recognized that, "[a]s part of the streamlined, flexible process under subchapter V, the Bankruptcy Code sets a baseline requirement that a debtor commit three years of projected disposable income, while it also affords the bankruptcy court discretion to require more as a condition of finding a plan fair and equitable."   *In re Orange Cnty. Bail Bonds, Inc*., 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022).   Accordingly, the Court must determine whether the "baseline

34

requirements of § 1191(c) are fair and equitable or [the Court] should require more." *Trinity Family Practice,* 661 B.R.at 815–16.

There is a split of authority as to whether § 1191(c) contains a presumption that a three-year payment period is fair and equitable, which the court can extend upon a showing of unusual circumstances, or whether, upon objection, the debtor has the burden to prove that the minimum plan length is fair and equitable, regardless of the existence of unusual circumstances. *Compare Urgent Care Physicians*, 2021 WL 6090985, at *10, with *Trinity Family Practice,* 661 B.R. at 815–16. Under either view, courts have essentially applied a totality of the circumstances analysis, which considers the specific facts of the plan and the debtor's financial situation, viewed against the backdrop of the Congressional purpose in enacting Subchapter V—that Subchapter V be quicker and easier for small businesses. *See generally Urgent Care Physicians*., 2021 WL 6090985, at *10 ("Congress's recognition that small businesses typically have shorter life-spans than large businesses suggests that a plan term of three years is more reasonable, generally speaking (or as a default), than a five-year term, absent unusual circumstances."); *Trinity Family Practice*, 661 B.R. at 821–22 (considering a list of nonexclusive factors in light of the purpose of Subchapter V. For example, in *Trinity Family Practice*, the court considered: (1) whether the debtor's financial projections include reservations for capital expenditures that would benefit the debtor after the plan period but would deplete the amount to be paid to creditors; (2) whether projected income and expenses during the plan payment period are reasonable,

35

especially as compared to the debtor's historic operations; (3) whether the plan provides for an increase in payments and distributions to insiders during the payment period and whether such payments are necessary, reasonable and appropriate; (4) whether there is evidence of "belt-tightening" behavior by the debtor; (5) the impact of a longer plan payment period on the debtor and its employees, customers and creditors, keeping in mind Congress's intent that Subchapter V be quicker and easier for small businesses than a traditional Chapter 11 case; and (6) any "unique or extraordinary facts or circumstances specific to a particular case that are not considered under one of the other factors."   *Id*. at 822.

Having considered all the evidence presented at the confirmation hearing, the Court concludes that, whether the Court applies a presumption that three years is sufficient absent unusual circumstances, or instead requires Debtor to establish that a five-year plan is not required to treat Mr. Lester fairly and equitably, the Plan meets the fair and equitable requirement.   The Bankruptcy Code requires a Subchapter V debtor to use the disposable income it is projected to receive over the plan term to make payments under the plan.   It does not require the debtor pay its projected disposable income to a particular creditor or a class of creditors.   Here, Debtor would like to exit this case after the minimum three years and is essentially willing to pay its Class 2 creditors in three years what they would have gotten paid in a longer plan.   To do so, it has negotiated with Mr. Panjwani to pay from his personal funds the very substantial administrative claims for professional compensation that would otherwise have to be paid by Debtor from its projected disposable income, which

36

would have reduced the amount received by Class 2 creditors by at least $100,000, probably more.   Additionally, Debtor has negotiated with 400 Edgewood to agree to have its prepetition rent claim treated as a general unsecured claim, even though it could have insisted on full payment of the claim as a condition of allowing assumption of the lease. "While at first blush the simple math of an extended plan term might seem to generate a higher payment to unsecured creditors, the inherent risks to the small business debtor of that extension could defeat the unsecured creditors' desire for greater recovery.   The three-year term here is fair and equitable, as it properly balances the risks and rewards for both the debtor and its creditors."   *Urgent Care Physicians*., 2021 WL 6090985, at *11.

As to the *Trinity Family Practice* factors, Debtor's budget does not provide for capital expenditures that would benefit Debtor in the future to the detriment of the Class 2 creditors.   To the contrary, Debtor has indicated it will likely cease operating its business after the three-year plan period.   As discussed above, the financial projections are more than reasonable, as they were based on optimistic assumptions that inure to the benefit of the Class 2 creditors, and Mr. Shumway more than adequately explained why Debtor is and will be less profitable than it was before Mr. Lester obtained his judgment.   The Plan does not provide for an increase in payments and distributions to insiders during the payment period.   Rather, Mr. Panjwani has gone from receiving a salary and substantial distributions to receiving no distributions or salary and proposes to do so for three years. There is certainly evidence of "belt-tightening" behavior by Debtor, as it will receive

management services from Mr. Panjwani for which it previously paid a salary for, it will not have to pay for the full amount of the unpaid prepetition rent due under the lease to assume it, and it will not have to pay for the bulk of its professional fees.   As to the impact a longer plan would have on all stakeholders in this case, the Court acknowledges that Mr. Lester would benefit from a longer plan that contains all these concessions that Mr. Panjwani has voluntarily agreed to make.   Setting aside the fact that Mr. Panjwani might not be willing to make any of these concessions to confirm a longer plan (and 400 Edgewood has already indicated it does not intend to extend the lease beyond three years), it is not reasonable to expect him to continue working for Debtor for free for five years. Finally, as to the existence of any "unique or extraordinary facts or circumstances specific to a particular case," Mr. Lester asserts that it is not fair that, even though *Mr. Panjwani* clearly has the ability to waive his "money wand" and pay him more, Debtor will receive a discharge of its liability for his injuries by proposing a plan that satisfies the minimum requirements of Subchapter V.   *See* Creditor Lamar Lester's Post Hearing Brief, Doc. 195 at 27.   The reality is that *Mr. Panjwani* does not have a legal obligation to pay Mr. Lester and, even though the temporal term of the Plan is only three years, the benefit provided to Mr. Lester exceeds the minimum requirement.   The Court will require nothing more.

**IV.**     **Conclusion**

    For the reasons set forth herein,

    IT IS HEREBY ORDERED that Mr. Lester's objections to the Plan are

OVERRULED;

IT IS FURTHER ORDERED that the Court will confirm the Plan (Doc. 101, as modified by Doc. 187) under § 1191(b) in a separate order conforming to the Memorandum of Decision and Order;

IT IS FURTHER ORDERED that Debtor's counsel shall promptly submit that separate order as provided herein.

## END OF DOCUMENT

**<u>Distribution List</u>**

ALL PARTIES ON THE COURTS MAILING MATRIX.